[Civ. No. 5433. Fourth Dist. Sept. 27, 1956.]

LOUIS S. SALMONS et al., Respondents, v. MORONI JAMESON et al., Appellants.

---

*Assigned by Chairman of Judicial Council.

Robert E. Krause and Fox & White for Appellants.

Glenn & Wright for Respondents.

MUSSELL, J.—This is an appeal by the defendants in an action for specific performance and to quiet title. On May 20, 1946, plaintiffs were the owners of a 930-acre ranch of mountain property in the vicinity of Palomar Mountain in San Diego County. They had acquired this property in 1905 or 1906 and had lived on it continuously from 1907 or 1908 and used it for farming and cattle raising. On May 20, 1946, plaintiffs were visited by the defendants, Dr. Jameson and his wife, and Dr. Jameson's brother, Joseph. The Jamesons were interested in buying the ranch. Salmons said that it was for sale at the total price of $65,000. A memorandum of agreement was then signed by Dr. Jameson and Louis Salmons purporting to be an option to purchase 900 acres at a total purchase price of $65,000 and it was agreed that an escrow should be opened. Salmons testified that he told Jameson he wished to retain 30 acres of the ranch and build a house on it; that he "showed them" the 30 acres. On June 30, 1946, the parties entered into a written contract whereby defendants agreed to purchase the ranch, containing 930

acres, for the sum of $65,000. This agreement further provided as follows: "It is further understood that 30 acres are to be deeded back to Louis S. Salmons and Hodgie B. Salmons starting approximately 400′ west of the cattle guard on south side of county road on east grade of Palomar Mt." Louis Salmons testified that when Mrs. Jameson was writing this agreement "We told her to hold the 30 acres there and we would build our house there"; that "I showed Mr. Jameson right where the 30 acres lay and explained everything to him before the contract was drawn up"; that "We stood and pointed a hundred feet across the road. I said, 'Now there is the 30 acres in there. I am going to build on that point'" and "I showed him where the spring was"; that he had an understanding with Dr. Jameson that the 30 acres was to start at a point approximately 400 feet west of the cattle guard on the south side of the county road and run west.

The parties went into escrow at the Security Trust and Savings Bank of San Diego and escrow instructions were signed on July 10, 1946. These instructions contained, among other things, the following provision: "The purchaser herein is to deed to sellers 30 acres of the property involved in this escrow after close of escrow. Description of said 30 acres to be agreed upon by both parties. It is understood by both buyer and seller that your bank assumes no responsibility or liability as to the description of the said 30 acres or to the delivery of the deed conveying said 30 acres."

On July 16, 1946, Salmons and his wife executed and delivered to the escrow holder a grant deed to the entire ranch, including the 30 acres here in question. Defendants executed and delivered a note and trust deed to the escrow holder as security for the unpaid balance of the purchase price. Both the deed and the trust deed were recorded in 1946 and defendants paid the entire balance by 1954. In the spring of 1947 plaintiffs began the construction of their house and the making of improvements on the 30-acre tract referred to in the agreement of June 30, 1946, and expended approximately $25,000 thereon. The house was adobe, with a tile roof. A mixed black top road leading from the county road to the house was laid and a water system was installed from the spring on the property. Dr. Jameson knew in the early part of 1947 that Salmons had built his house on the 30 acres involved and made no objection, stating that the reason he did not object was that he understood that the property would

come back to them when the Salmonses died and that the general area surrounding the house was all right with him.

On numerous occasions after the sale had been completed, Salmons asked Dr. Jameson for a deed to the 30 acres. Dr. Jameson "stalled it off" but never said until 1954 that he was not willing to deed back the 30 acres. In the latter part of 1954 Salmons went to Dr. Jameson's office in Fallbrook and demanded a deed. The doctor then for the first time claimed that the Salmonses had only a "life lease" and he refused to give Salmons a deed to the 30 acres. It is undisputed that defendants paid the taxes on the entire 930 acres, including the house built by plaintiffs and that the property taxes on the said 30 acres and improvements betweeen 1946 and 1955 amounted to $1,434.86.

Garth Batt, a title engineer, employed at the Security Title Company as a title engineer, prepared from the agreement of June 30, 1946, a map of the 30 acres involved. He used a point 400 feet west of the cattle guard referred to in said agreement as a starting point on the south side of the county road. A fence ran north and south from this point and he established the east boundary as parallel to this fence. He used the United States Geological Survey of the area made in 1950 to indicate the location of the Salmons house and to place it on the map which he prepared (plaintiffs' Exhibit 7). He extended the east boundary south parallel to the fence to a section line; thence west approximately 1,200 feet; thence north to the county road; thence generally southeasterly along said road to the point of beginning. The trial court accepted the description prepared by Batt as describing the 30 acres involved and found that the defendants now hold legal title to the said 30 acres so described as trustees for plaintiffs. Judgment was entered decreeing, *inter alia,* that the defendants execute and deliver to plaintiffs a grant deed conveying to them all of the 30 acres described in the decree, free and clear of all encumbrances, and decreed that defendants are disbarred, restrained and enjoined from asserting any right, title or interest therein, and further that plaintiffs pay defendants the sum of $1,434.86 taxes theretofore paid by defendants.

Defendants appeal from the judgment and set forth numerous grounds, principally based upon the argument that the evidence is insufficient to support the findings. The first argument presented is that "The trial court erred in holding that a written contract to deed back 30 acres of land after close of escrow—description of said 30 acres to be agreed

upon by both parties, where no agreement was reached, was specifically enforceable in equity."

As was said in *Beverage* v. *Canton Placer Mining Co.*, 43 Cal.2d 769, 774, 775, 776 [278 P.2d 694]:

"To satisfy the statute of frauds, the memorandum affecting the sale of real property must so describe the land that it can be identified with reasonable certainty. . . . This is one of the most essential parts of such an agreement."

It was further held:

"Preferably, the writing should disclose a description which is itself definite and certain. Alternatively, however, a description fulfills the test of reasonable certainty if it furnishes the 'means or key' by which the description may be made certain and identified with its location on the ground. . . . The applicable principle is that that is certain which can be made certain . . . and parol evidence in proof thereof, admitted not for the purpose of furnishing or supplying a description . . . but for the purpose of applying the given description of the earth's surface, thereby identifying the property. . . . Courts have been most liberal in construing executory contracts for the sale of real estate and have sought, as far as is consistent with the above established rules, to give effect to the intention of the parties in applying descriptions to property. . . . A description or designation in itself of meagre and doubtful character may be deemed sufficient on its being made to appear by proper allegation and proof that at the place indicated the vendor owned premises answering to its terms and owned at that place no other such property."

In the instant case the evidence shows that plaintiffs have fully performed their part of the agreement, have been let into possession of the 30-acre tract and have made substantial improvements thereon with the knowledge and consent of the defendants.

In Pomeroy, Specific Performance of Contracts (3d ed.), section 145, page 378, the author states:

"In order that any agreement, whether covered by the statute or not, whether written or verbal, may be specifically enforced, it must be complete in all its parts; that is, all the terms which the parties have adopted, as portions of their contract, must be finally and definitely settled, and none must be left to be determined by future negotiation; and this is true without any regard to the comparative importance or unimportance of these several terms. . . . It should also be

remarked that, when a contract has been partly performed by the Plaintiff, and the Defendant has received and enjoys the benefits thereof, and the Plaintiff would be virtually remediless unless the contract were enforced, the Court, from the plainest considerations of equity and common justice, does not regard with favor any objections raised by the Defendant merely on the ground of the incompleteness or uncertainty of the agreement. Even if the agreement be incomplete, the Court will then, in furtherance of justice and to prevent a most inequitable result, decree a performance of its terms as far as possible . . . In fact, one ground of the equitable jurisdiction to decree specific performance is the incompleteness of the contract which would prevent an action at law, but which exists to such a limited extent and under such circumstances that a refusal to grant any relief would be plainly inequitable.''

In *Kelley* v. *Russell*, 50 Cal.App.2d 520, 529 [123 P.2d 606], the court said:

''Appellant's next point is that these option contracts cannot be specifically enforced because they were uncertain and lacked mutuality. This is based on one of the findings of the court to the effect that there is no ten-acre parcel containing a water well, spring or other water supply which is defined or can be identified by the terms of the leases, and that the appellant has failed and refused properly to designate or specify any such ten-acre parcel which he claims the right to except from the conveyance. From this it is argued that the option provisions are so uncertain that they cannot be specifically enforced. Any uncertainty which exists arises neither from the terms of the options nor from the court's finding but from the refusal of the appellant to designate any such parcels upon which a water supply existed without including land upon which the oil wells were located. The mere fact that the appellant had the right under the options to claim and exclude from the forty-acre tracts, which the respondents were obliged to offer to purchase, any ten-acre parcels upon which a water supply had existed at the time in question, does not make these option contracts so uncertain as to be unenforceable. (*Lange* v. *Waters,* 156 Cal. 142 [103 P. 889, 19 Ann.Cas. 1207] ; *Stamm* v. *Colvin,* 94 Cal.App. 180 [270 P. 744] ; *Janssen* v. *Davis,* 219 Cal. 783 [29 P.2d 196].) If the appellant desired to exercise the right given him to exclude any ten-acre tracts from the conveyances he was required to make, this exclusion depended upon facts which were readily

determinable and the entire matter was one which was well within the powers of a court of equity. (*Relovich* v. *Stuart*, 211 Cal. 422 [295 P. 819] ; *Fleishman* v. *Woods,* 135 Cal. 256 [67 P. 276].) ''

█ Under the rules announced in the foregoing authorities, we are in accord with the trial court's finding that the agreement of June 30, 1946, provided a means or key by which the description of the 30 acres contained therein could be applied to the earth's surface and the metes and bounds description of said 30 acres prepared, and further that the contract was enforceable by specific performance under the circumstances shown.

It was conceded at the trial by counsel for the defendants that the Salmonses ''had a perfect right to live the rest of their days on this property and to build their home there.'' Dr. Jameson had no objection to the particular location of the 30-acre tract described, stating that this was because it was coming back to the ranch when the Salmonses died. In this connection, the doctor testified that at the time of the execution of the contract of June 30, 1946, Salmons said that ''. . . (h)e and Mrs. Salmons had lived all their life on Palomar Mountain, or approximately 50 years, and they wished to remain, that is, live the rest of their lives on the mountains, and would it be all right with us if they lived on the ranch, and we said certainly. So Louie and Mrs. Salmons asked if we would deed them 30 acres, and we said yes, and I asked Louie what would become of the 30 acres when he and Mrs. Salmons died, and he said it would return to the ranch because they never wished to see the ranch broken up.'' However, Salmons testified that some time in 1954 he was informed for the first time by Dr. Jameson that he, Salmons, had only a life lease on the property; that there were several discussions about the 30 acres and Dr. Jameson never mentioned a life lease until he, Salmons, demanded a deed. The escrow officer testified that none of the parties mentioned anything about a life estate to him. No mention is made of such an estate in the contract of June 30, 1946. The foregoing testimony merely created a conflict for the determination of the trial court and its implied finding that no life estate was agreed upon is supported by the record.

█ Defendants argue that the court erred in finding that the statute of limitations did not bar plaintiff's cause of action and cite sections 335 and 337, subdivision 1, of the Code of Civil Procedure (four-year limitation). However, in *Adams* v.

*California Mut. B. & L. Assn.,* 18 Cal.2d 487, 488, 489 [116 P.2d 75], it is held that it is well settled that a person by his conduct may be estopped to rely upon these defenses (of laches or the statute of limitations) and that where the delay in commencing action · is induced by the conduct of the defendant it cannot be availed of by him as a defense. In the instant case the evidence shows that Salmons repeatedly asked for a deed to the property and that Dr. Jameson "stalled it off" and that his refusal to execute a deed was not made until 1954. ▮ Mere lapse of time does not constitutes laches unless accompanied by circumstances showing prejudice to the opposing party. (*Beverage* v. *Canton Placer Mining Co., supra,* 43 Cal.2d 769, 777, 778.) ▮ In the instant case no prejudice was shown. ▮ Moreover, Salmons and his wife took possession of said property and made valuable improvements thereon on the faith of the agreement. This was enough to take the case out of the statute of frauds. (*Magee* v. *Magee,* 174 Cal. 276, 280 [162 P. 1023].)

The findings on the material issues here involved are supported by substantial evidence and cannot be here disturbed. The weight and sufficiency of the evidence, the construction to be placed upon it and the inferences to be drawn therefrom were matters for the trier of the facts. Likewise, questions as to the credibility of a witness and the determination of conflicts and inconsistencies in his testimony were for the trial judge. (*Dillard* v. *McKnight,* 34 Cal.2d 209, 223 ·[209 P.2d 387, 11 A.L.R.2d 835].)

The judgment is affirmed.

Griffin, Acting P. J., and Burch, J. pro tem.,* concurred.

A petition for a rehearing was denied October 23, 1956, and appellants' petition for a hearing by the Supreme Court was denied November 21, 1956.

---

*Assigned by Chairman of Judicial Council.